IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DELONG CO., INC.,

                 Plaintiff,

   v.

SYNGENTA AG,                                           OPINION and ORDER
SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION,                                        23-cv-321-jdp
SYNGENTA CROP PROTECTION, LLC,
SYNGENTA BIOTECHNOLOGY, INC., and
SYNGENTA SEEDS, LLC,

             Defendants.

This case arises out of the development of a genetically modified corn seed called Viptera that contains a trait called MIR162. Plaintiff DeLong Co., Inc., which exports corn and corn feed, contends that Syngenta AG and affiliated companies (collectively, "Syngenta") were negligent in the timing, scope, and manner of their commercialization of MIR162 and Viptera. Specifically, DeLong contends that Syngenta began selling Viptera throughout the United States before China had approved MIR162, and Syngenta did not control the scope of commercialization or warn farmers about potential consequences if MIR162 became commingled with other corn before China approved MIR162. As a result, DeLong says that it lost nearly $18 million after China began rejecting corn products from the United States because they contained MIR162.

The case has been transferred back to this court for trial after proceeding as part of multidistrict litigation (MDL) since 2017. This order will resolve motions filed by both sides to exclude testimony of the other's experts. The parties filed those motions nearly three years before the case was transferred back to this court, and much of the case law cited by the parties

comes from 10th Circuit and the District of Kansas, where the MDL was proceeding. But neither side has asked for an opportunity to update their briefs or file supplements based on Seventh Circuit law, so the court will decide the motions as they are currently filed.

BACKGROUND

A. Factual background

Most of the facts below come from the parties' pretrial report. Dkt. 198-1. The parties have stipulated to few facts, so the court provides the following facts for context only and does not make any findings about which facts are disputed or undisputed.

DeLong is based Clinton, Wisconsin. One component of its business is to export dried distiller grains with solubles, or DDGS, which are corn ethanol byproducts that are used as feed for livestock. It also exports corn. It does not grow its own corn but instead obtains corn and DDGS from other suppliers.

Syngenta develops, markets, and sells agricultural products, including genetically modified corn seeds. One of these seeds is called Viptera, which contains a genetic trait called MIR162. Syngenta says that MIR162 is beneficial because of its unique ability to control corn pests.

In April 2010, the United States approved MIR162 for unrestricted planting. Other countries such as Canada and Japan followed suit, but Syngenta's application for approval in China remained pending. Syngenta began selling Viptera to farmers in the United States in 2010 for planting in 2011. DeLong alleges that Syngenta told its customers that MIR162 would be approved by China in 2011 or 2012.

In 2012, China rejected Syngenta's application, prompting Syngenta to submit revised applications between 2012 and 2014.

In November 2013, China began rejecting shipments of U.S. corn because the corn contained MIR162. In December 2013, China rejected one of DeLong's corn shipments.

For a few months, China continued accepting DDGS from the U.S. But in July 2014, China announced that DDGS shipments from the U.S. would need to be accompanied by a government certification that the shipment did not contain MIR162. This had the effect of stopping all U.S. exports of DDGS to China because MIR162 had become commingled throughout the U.S. corn supply. In December 2014, China approved MIR162 for import.

DeLong says that more than half of its DDGS exports were going to China at the time that China placed restrictions on DDGS coming from the U.S. DeLong also says that the loss of the Chinese market harmed it by leading to reduced sales of DDGS, lower prices on DDGS sales in other markets, and canceled contracts. DeLong says that it tried to mitigate its losses by entering into alternative transactions, such as corn spread trades and sales of DDGS on barges, but those mitigation efforts were unsuccessful, leading to more losses. In total, DeLong says that it lost $17.76 million because of Syngenta's conduct.

DeLong's theory of negligence is that Syngenta should have either waited to commercialize Viptera until it was approved in China or "undertake a narrowly-tailored launch of Viptera in the United States, ensuring that Viptera corn would not enter the corn export market." Dkt. 198-1, at 9. Syngenta says that it acted in accordance with industry standards and that DeLong hasn't shown that any of its losses are fairly attributable to Syngenta's conduct.

**B. Procedural history**

In 2014, corn growers began filing lawsuits against Syngenta based on its decision to commercialize MIR162 before obtaining approval from China, contending that Syngenta's conduct resulted in lower corn prices. The Judicial Panel on Multidistrict Litigation consolidated most of these cases and transferred them to the District of Kansas for pretrial proceedings. *In re: Syngenta AG MIR162 Corn Litigation*, 65 F. Supp. 3d 1401 (U.S. Jud. Pan. Mult. Lit. 2014). Thousands of lawsuits were eventually filed, including more than 2,000 in Minnesota state court. *In re Syngenta Mass Tort Actions.*, No. 16-cv-255, 2016 WL 3680735, at *1 (S.D. Ill. July 12, 2016). The MDL court certified a nationwide class and eight statewide classes consisting of corn growers. *In re: Syngenta AG MIR 162 Corn Litigation*, No. 14-md-2591, 2016 WL 5371856 (D. Kan. Sept. 26, 2016). It then held a trial on the Kansas class's claims, *In re Syngenta AG MIR 162 Corn Litigation*, No. 14-md-2591, 2017 WL 2876767, at *1 (D. Kan. July 6, 2017), and entered judgment in favor of the plaintiffs for $217,000,000, *In re Syngenta AG MIR 162 Corn Litigation*, No. 14-md-2591, 2017 WL 4021186, at *1 (D. Kan. Sept. 13, 2017).

DeLong filed this case in October 2017, asserting claims for negligence, trespass, misrepresentation, and violations of the Lanham Act. The case was transferred to the MDL court shortly thereafter, Dkt. 7, but it was not consolidated with the other proceedings.

In December 2018, the MDL court granted final approval of a $1.5 billion settlement between Syngenta and multiple classes of corn farmers, grain handling facilities, and ethanol production facilities. *In re Syngenta AG MIR 162 Corn Litigation*, 357 F. Supp. 3d 1094 (D. Kan. 2018). DeLong was not part of that settlement.

In August 2019, the MDL court dismissed for failure to state a claim all of DeLong's claims in this case except negligence. Dkt. 23. In February 2021, the MDL court granted summary judgment to Syngenta on the ground that DeLong filed its claims after Wisconsin's six-year statute of limitations expired. Dkt. 144. As a result, the MDL court did not rule on five motions the parties had filed to strike expert testimony. The Court of Appeals for the Tenth Circuit reversed the summary judgment decision, concluding that there was a genuine issue of material fact regarding whether DeLong's was harmed by Syngenta's conduct more than six years before DeLong filed the lawsuit. *DeLong Company, Inc. v. Syngenta AG*, No. 21-3044, 2022 WL 1510596, at *2 (10th Cir. May 13, 2022).

After the case was remanded, a settlement conference failed, *see* Dkt. 166, so the MDL court ruled on Syngenta's other grounds for summary judgment, largely denying the motion. Dkt. 174. But the court dismissed DeLong's claims based on a genetic trait called Event 5307 and the seed called Duracade. DeLong had alleged that Syngenta was negligent in its commercialization of Event 5307 and Duracade, but the MDL court concluded that DeLong had not adduced evidence of harm. *Id.* at 13–14. The MDL court also granted summary judgment to DeLong on affirmative defenses that Syngenta asserted based on comparative negligence. *Id.* at 15–18. The MDL court transferred the case back to this court without ruling on the pending motions to strike expert testimony.

The parties say that there are no other MIR162 cases pending against Syngenta in federal court. But they identify cases that are still pending in Louisiana and Minnesota state court.

ANALYSIS

## A. Legal standard

The parties' motions seek to exclude testimony from a total of five experts. DeLong challenges two of Syngenta's liability experts (Christian Krupke and Philip Shull) and one of its damages experts (Quentin Mimms); Syngenta challenges one of Syngenta's liability experts (Joseph Keaschall) and one damages expert (Colin Carter).

Expert testimony is admissible if it meets five requirements:

1) the witness is qualified as an expert by knowledge, experience, training, or education;

2) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

3) the testimony is based on sufficient facts or data;

4) the testimony is the product of reliable principles and methods; and

5) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Burns v. Sherwin-Williams Co.*, 78 F.4th 364, 373 (7th Cir 2023). The court of appeals has distilled these requirements into three questions: (1) is the expert qualified to give the testimony at issue? (2) did the expert use a reliable method to reach his or her conclusions? and (3) is the expert testimony relevant? *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

The court will consider the challenges to the liability experts first, followed by the challenges to the damages experts.

**B. Liability opinions**

**1. Syngenta's motion to exclude Joseph Keaschall**

DeLong disclosed Keaschall as an expert on the benefits of MIR162. DeLong did not retain Keaschall. In fact, he had died years before DeLong chose him. But he had served as an expert for other plaintiffs in the MDL case. He was too ill to testify at the MDL trial, but Syngenta deposed him twice, including once after it was determined that he could not attend the trial. No. 14-md-2591 (D. Kan. May 26, 2017), Dkt. 3184. DeLong seeks to use Keaschall's report and deposition testimony in this case; Syngenta objects.

This is not the first time DeLong attempted to rely on disclosures from an expert that it did not retain. DeLong also disclosed Randal Giroux to testify about the standard of care in the context of commercializing new biotechnology. Dkt. 65. Giroux had previously testified in the MDL proceeding, and DeLong wished to reuse his expert report and testimony in this case. In response to the disclosure, Syngenta served a subpoena on Giroux to depose him, and Giroux moved to quash the subpoena. *See* Dkt. 127. The MDL court concluded that Rule 26 gave Syngenta the right to depose any expert witness disclosed by DeLong, but that ordering Giroux's deposition would essentially allow DeLong to force Giroux to serve as its expert without retaining him, so the court excluded Giroux's testimony. *Id.* at 5–6.

The factual context for DeLong's disclosure is not the same as its disclosure of Giroux, but the result is the same. As with Giroux, Syngenta says it wants to depose Keaschall, but it is obviously unable to do so. Rule 26 gives Syngenta the right to depose DeLong's experts: "A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided." Fed. R. Civ. P. 26(b)(4)(A).

7

DeLong says that Syngenta has no right to depose Keaschall now because it previously deposed him. But that was in the context of a different case involving different plaintiffs. There is no asterisk in Rule 26(b)(4)(A) stating that it doesn't apply if the party had a previous opportunity to depose the expert in a different case. The plain language of the rule gives a party the right to depose an expert witness in any case the witness is disclosed. The rule does not require the party to anticipate the possibility that a different party in a future case could attempt to rely on the same expert materials.

The court will exclude Keaschall's testimony.

### 2.  DeLong's motion to exclude Christian Krupke

Krupke is an entomologist who specializes in the management of corn pests.  Among other things, he offers opinions about the efficacy of MIR162 in controlling corn pests. The court understands Syngenta to be offering Krupke's testimony as part of its attempt to show reasonableness, specifically that it was reasonable for Syngenta to commercialize MIR162 when and how it did because of how beneficial MIR162 was. DeLong raises four issues in its motion to exclude parts of Krupke's testimony: (1) Krupke opined on issues that are outside his expertise; (2) Krupke's expertise is limited to the benefits of MIR162 in Indiana; (3) Krupke relied on studies after Syngenta commercialized MIR162, and so they could not support a finding that Syngenta acted reasonably at the time of commercialization; and (4) Syngenta untimely disclosed field studies, so it should not be allowed to rely on those studies.[1]

---

[1] DeLong also challenges Krupke's opinions related to Event 5307, which is the name of the genetic modification in Syngenta's Duracade product. Because the MDL court previously granted Syngenta's summary judgment motion based on damages caused by Duracade, *see* Dkt. 174, at 13–14, Krupke cannot offer those opinions.

### a. Opinions outside Krupke's expertise

DeLong first contends that Krupke "is not qualified to offer the opinions in his report." Dkt. 97, at 12. A problem with the argument is that DeLong doesn't precisely identify the opinions it is referring to. In its opening brief, it says that Krupke is not qualified to opine on "the economic benefits of biotechnology," "the efficacy of MIR162," and "the cost-benefit analysis of Bt corn traits." Dkt. 97, at 13–14. But DeLong does not cite any specific portions of Krupke's report that it is challenging. *See id.* at 12–16.

In its reply brief, DeLong appears to narrow its challenge. It concedes that Krupke is qualified to testify about MIR162's efficacy in controlling pests. Dkt. 129, at 7. But DeLong says that Krupke is not qualified to testify about the "*general* benefits of biotechnology (and the significant economic impacts to farmers.)." *Id.* at 6 (emphasis in original). DeLong doesn't explain what it means by "general benefits," but it cites paragraphs 24, 68, and 69 of Krupke's report as containing the challenged opinions. Paragraph 24 includes basic facts about the size of the U.S. corn industry, including that American farmers planted 92 million acres in 2020, generating $48 to 60 billion in revenue to farmers. Paragraphs 68 and 69 are about the increased income that corn created through biotechnology has generated to farmers since 1996. Syngenta discussed those opinions in its opposition brief, so it is fair to consider whether the statements in those paragraphs are admissible expert testimony.

The court concludes that Krupke may not offer opinions based on paragraphs 24, 68, or 69 because those paragraphs are not tied to Krupke's area of expertise, which is MIR162's usefulness in controlling pests. Krupke is not an economist, and he does not purport to have any specialized knowledge in that field. The purpose of Krupke's testimony is to show why it was important to commercialize MIR162 sooner rather than later from the perspective of an

entomologist, not to discuss the corn industry generally or how corn created through biotechnology generates income. So the court will exclude any testimony from Krupke based on paragraphs 24, 68, and 69.

### b.  Geographic scope of opinion

DeLong says that Krupke should not be permitted to testify about the efficacy of MIR162 outside Indiana because his own field studies have been limited to that state. The court will overrule this objection for two reasons. First, DeLong does not cite evidence suggesting that the benefits of MIR162 on corn grown in Indiana would be substantially different from corn grown in another state. Rather, Krupke testified that "the biology and entomology and natural history of these pests is very similar, regardless of what state you find them in." Dkt. 207, at 168:5–10. So this is an issue that goes to the weight rather than the admissibility of testimony based on Krupke's own field studies.

Second, Krupke is not limited to relying on his own field studies. He is qualified to review and analyze research from secondary sources. The sources Krupke considered were not limited to Indiana field studies; they included research from other regions.

### c.  Data not available until after commercialization

DeLong challenges Krupke's reliance on any study that was published after Syngenta commercialized MIR162, reasoning that Syngenta could not have relied on those studies, so they aren't evidence of Syngenta's reasonableness. Syngenta says that later studies are relevant as evidence that supports Krupke's opinions.

The parties' dispute raises the question of how a jury measures reasonableness in the context of weighing the benefits and harms of the defendant's conduct. Neither side cites any

authority that directly addresses the issue. But DeLong's position is consistent with how negligence is defined under Wisconsin law:

> A person is negligent when (he) (she) fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.

Wis JI-Civil 1005, "Negligence: Defined." If the defendant's conduct is evaluated based on what a reasonable person would do "in similar circumstances" and on what a reasonable person "would recognize" as unreasonably risky, it follows that the factfinder is limited to considering what a reasonable person would have known *at the time* the defendant made the decision at issue. A defendant's circumstances necessarily include the information that was available then. This principle is reflected in the Restatement (Second) of Torts, which states that a defendant being sued for negligence "is treated as though he knew those things which the reasonable man at that time and place would know." § 290, cmt. e (1965).

Case law applies the above principle most commonly in the context of evaluating whether the defendant should have foreseen the risk to the plaintiff. *The Nitro-Glycerine Case* is an early illustration of this principle. 82 U.S. 524 (1872). The defendant operated a delivery service, and its employees noticed that a package was leaking a substance that "resembled sweet oil." *Id.* at 534. When employees opened the package to investigate, it exploded, "injuring the premises occupied by them and other premises leased by the plaintiff." *Id.* As it turned out, the package contained nitroglycerine. But the Court held that the defendant was not negligent because it did not know nor reasonably could have known that the package was dangerous at the time its employees opened it. *Id.* at 534–35.

11

The same principle is observed in more recent cases as well. For example, in *Kuklinski v. Rodriguez*, the plaintiff was injured from falling down stairs while he was intoxicated. 203 Wis. 2d 324, 328, 552 N.W.2d 869, 871 (Ct. App. 1996). The doctor who examined the plaintiff did not diagnose a head injury. *Id.* Two hours later, the plaintiff was in a coma as result of brain bleeding. *Id.* The plaintiff sued the doctor, alleging he was negligent for failing to perform a CT scan. In upholding the jury's verdict that the doctor was not negligent, the court emphasized that "the focus of an evaluation of whether a physician is negligent for failing to disclose available methods of diagnosis or treatment is on the circumstances then existing in the particular case." 552 N.W.2d at 872. The question is not about the plaintiff's "*actual* condition viewed in retrospect, but . . . what [the defendant] reasonably knew it to be." *Id.* (emphasis in original).

Somewhat closer to the facts of this case is *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 444 (6th Cir. 2009), in which the Sixth Circuit applied Kentucky law, which uses the same definition of negligence as Wisconsin law. The plaintiff sued his father's employer for negligently exposing him to asbestos in the 1950's. In affirming summary judgment in favor of the employer, the court rejected an expert report that discussed the dangers of asbestos:

> Not only does the report not indicate whether the risk was knowable before 1952, it is insufficient that the danger was merely knowable—the knowledge has to have been available to the defendant. There has been no showing of any general knowledge of bystander exposure in the industry. . . . Without any published studies or any evidence of industry knowledge of bystander exposure, there is nothing that would justify charging [the employer] with such knowledge during the time that [the plaintiff's] father was working with asbestos.

*Id.* at 445–46.

*Kuklinski* and *Martin* support the view that a party may not prove or disprove negligence with information that was unavailable at the time of the defendant's challenged conduct. The court in *Dewick v. Maytag Corp.* made a similar point: "If the question at issue is Maytag's exercise or nonexercise of due care in connection with its design of the broiler door, as would surely seem to be the case under ordinary negligence principles, testimony as to what materials the expert has relied on post hoc-as to which there is no proof that Maytag itself ever considered such materials—is surely problematic." No. 03 C 1548, 2004 WL 2967533, at *2–3 (N.D. Ill. Dec. 2, 2004).

The above cases were about the defendant's knowledge of the risk of harm, but Syngenta points to no principled reason for adopting a different rule when it comes to a defendant's knowledge of potential benefits. If a plaintiff may not rely on studies conducted after the fact to prove that the defendant's conduct was dangerous, then it follows that the defendant may not rely on studies conducted after the fact to show that its conduct was beneficial. Either way, the general rule should apply: "[I]t is not with hindsight that negligence is measured." *Johnson v State*, No. 89486, 663 N.Y.S.2d 790, 796, 1997 N.Y. Slip Op. 97532, 1997 WL 613352 (N.Y. Ct. Cl. Sep. 4, 1997).

Syngenta cites only one case to support a contrary conclusion, but the case is not instructive. In *Sprint Communications Company L.P. v. Comcast Cable Communications LLC*, the court considered whether an expert giving an opinion about invalidity in a patent case was categorically barred from discussing references that post-dated the patent's priority date. 225 F.Supp.3d 1233, 1244 (D. Kan. 2016). The court concluded that there were some instances in which such references would be relevant, including to "show that the invention was conceived at a particular (prior) time, or that the invention was eventually reduced to practice,

or that the inventor acted diligently in the interim, or that the invention did practice all of the limitations of the patent-in-suit." *Id.* This reasoning has no bearing on determining whether Syngenta may rely on recent studies to show that it was not negligent.

The court will grant this part of DeLong's motion to strike Krupke's testimony. Krupke may not support his opinion with information that would not have been available to Syngenta at the time it commercialized MIR162. If there are disputes about what information in Krupke's report meets that standard, the parties will have to ask for further guidance in a motion in limine.

### d.  Late disclosure of field studies

DeLong wants to preclude Syngenta from offering any testimony based on four field studies that Syngenta provided to DeLong after the deadline for expert disclosures. Syngenta says that it will not be relying on those studies, Dkt. 117, at 21, so this request is denied as moot.

### 3.  DeLong's motion to exclude Philip Shull

Shull was an official with the U.S. Department of Agriculture for many years, including several in China. From 1987 to 1988, he was the director of the Agricultural Trade Office for the U.S. Embassy in Beijing; from 1988 to 1992, he was the director of the Agricultural Trade Office for the U.S. Consulate in Guangzhou, and from 2014 to 2016, he was the minister counselor for the department at the U.S. Embassy in Beijing.

Syngenta named Shull as an expert on the Chinese regulatory process. Dkt. 104-3. Neither side clearly explains the relevance of Shull's testimony in their briefs, but the court understands Syngenta's position to be that Shull's testimony is relevant to show Syngenta's reasonableness in choosing to commercialize MIR162 when it did. Specifically, the view is that

14

it would have been unreasonable to wait for China to approve MIR162 because China is unpredictable and there would be no way to determine when China would approve MIR162, regardless of how safe and beneficial it is.

DeLong does not question the relevance of Shull's opinions. But it challenges most of DeLong's opinions on other grounds, including that they are outside his expertise, that they are not based on an adequate foundation, and that they are not expert opinions. Before ruling on these objections, the court acknowledges that it is not writing on a blank slate. Shull was a retained expert for Syngenta in the MDL proceedings, he offered most of the same opinions then as he is now, the plaintiffs in the MDL proceedings raised some of the same objections that DeLong is raising now, and the MDL court overruled most of those objections. *See In re Syngenta AG MIR 162 Corn Litigation*, No. 14-md-2591, 2017 WL 1738014 (D. Kan. May 4, 2017).

DeLong was not a party to the MDL proceedings at the time the MDL court issued its decision, so this court will consider DeLong's objections. But the court will adopt some of the MDL court's rulings about Shull. Specifically, the court concludes that Shull may offer opinions that China's review of GMO applications is based on politics rather than science and that China did not have a functioning regulatory system during the relevant time. The court agrees with the MDL court that Shull is qualified to give these opinions and that he has an adequate factual basis to give them, even though his stint as minister counselor did not begin until 2014. *Syngenta*, 2017 WL 1738014, at *2–4. Even if Shull acquired much of his relevant knowledge in the months immediately following the events relevant to this case, DeLong does not point to evidence that there were significant changes in China's regulatory system between

15

2010 and 2016. So questions about whether Shull's observations apply to the decision to approve MIR162 go to the weight of Shull's testimony, not it's admissibility.[2]

The court will explain below its reasoning for allowing or excluding the other opinions in Shull's report that DeLong challenges.

### a. China is not a key market for corn and China is not a reliable importer of corn products

DeLong challenges Shull's opinion that China was not a "key market" for U.S. corn at the time that Syngenta commercialized MIR162. This opinion is included in several paragraphs of Shull's report. Dkt. 104-3, ¶¶ 12.1, 18, 58, 60–61, 190, 193, 240. The use of the phrase "key market" appears to be a reference to a 2009 policy statement of the Biotechnology Innovation Organization (BIO), which identifies itself as "the world's largest advocacy association representing member companies, state biotechnology groups, academic and research institutions, and related organizations across the United States and in 30+ countries."[3] DeLong asserts and Syngenta does not dispute that Syngenta agreed to follow the BIO policy.

The policy includes guidelines for companies that are commercializing products. Dkt. 104-11. One of the guidelines is to meet regulatory requirements for "key markets" and "key export markets" before commercialization. *Id.* at 5–6 and n.7. The policy does not define those terms, but Shull says that a market should not be considered "key" unless it is "a reliable

---

[2] An important caveat to the court's ruling: DeLong does *not* object to Shull's testimony on the ground that his opinions are based on information that would not have been available to Syngenta at the time it was deciding whether and how to commercialize MIR162. As a result, the court will not consider whether its rationale for limiting Krupke's testimony in § B.2.c of this opinion should also apply to Shull.

[3] https://www.bio.org/about.

and historical importer of the particular commodity at issue," and China doesn't meet that standard. Dkt. 104-3, ¶ 193.

DeLong objects to these opinions on the ground that Shull's definition of "key market" is made up and that his opinion about China being an unreliable market is not supported by data, especially any data from the period when Syngenta was commercializing MIR162 in 2010 to 2014. The court agrees with both views.

As for Shull's use of the term "key market," that is a term used in the BIO policy. Shull admitted that he is not an expert on BIO policy and was not familiar with it before Syngenta retained him. Dkt. 104-16, at 1441:14–18 and 1444:18–22. So if Shull is attempting to offer an opinion about what the BIO policy means, Syngenta hasn't shown that he is qualified to do that. If he is attempting to provide his own definition of "key market," that would likely be confusing for the jury because of the connection the term has with the BIO policy.

As for Shull's more general opinion that China was an unreliable importer of corn products, he says that support for that opinion can be found in section III.D of his report, which discusses China's efforts to boost domestic corn production since 2000, and its use of tariffs to restrict imports. Dkt. 104-3, ¶¶ 35–73. But there is little data in that section. Shull refers generally to "China's dearth of imports from 2000–2010," *id.*, ¶ 60, but he provides no figures about how much corn and DDGS was being imported into China during that time. In a different section of his report, Shull cites figures showing that DDGS exports to China steadily increased from 0 metric tons in 2005/2006 to more than 2 million metric tons in 2009/2010. *Id.*, ¶¶ 103–05. He also states that Chinese imports of DDGS fell to 1.6 million

17

metric tons in 2010/2011 as a result of an "anti-dumping" investigation. *Id.*, ¶ 106.[4] Thus, Shull's opinion that China was an "unreliable" and "unpredictable" importer of corn products appears to be supported by only one data point. That's not enough to support such a sweeping opinion. *See Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). The court will exclude these opinions.

### b.  A finding that Syngenta was negligent would give China "veto" power

The last section of Shull's report is called "China should not have a veto over what U.S. farmers may choose to plant in their fields." Dkt. 104-3, ¶¶ 239–44. DeLong objects to the opinions in this section as irrelevant and unsupported. In this section of the report, Shull makes the following assertions:

- A company does not violate any U.S. or WTO rule by selling a product in the U.S before China approves it. *Id.*, ¶ 239.

- If companies have to wait for China's approval, this will give China "a veto" over what farmers can plant. *Id.*, ¶ 240.

- "[I]t would be terrible agricultural and food-security policy for the United States to allow such a system to control what U.S. farmers can and cannot grow." *Id.*, ¶ 241.

- Giving China veto power "threaten advances in seed breeding technology in the U.S. and around the world." *Id.*, ¶ 242.

- "[T]here is no evidence that granting [veto] power to China would facilitate exports of U.S. corn or other biotech products." *Id.*, ¶ 243.

- "[I]t would be tragically ironic if in return for rejecting U.S. corn shipments under the pretext that they contained trace amounts of a perfectly safe high-tech corn variety, China were given veto power over the seed technology." *Id.*, ¶ 244.

---

[4] Shull says that "dumping" is the practice of a foreign country selling a product for a lower price than what is being offered domestically, and an anti-dumping investigation can inhibit sales because it raises concerns about higher duties. Dkt. 104-3, ¶ 106.

These opinions are a mix of policy statements, legal conclusions, and predictions. Under Wisconsin law, policy issues are generally an issue for the court to consider, not the jury. *Alvarado v. Sersch*, 2003 WI 55, ¶¶ 17–18, 262 Wis. 2d 74, 662 N.W.2d 350 (after jury decides negligence, court may limit liability for public policy reasons, including that "allowing recovery would place too unreasonable a burden on the tortfeasor"). Syngenta cites no authority for the view that the jury may consider policy opinions in the context of a negligence claim. As for the predictions about the effects of requiring companies to obtain approval from China before commercializing a product, Shull does not provide any basis for those conclusions. The court will exclude these opinions.

### c. Examples of food regulation decisions not based on science

As support for his opinion that "trade bans may only be intermittently enforced, depending on policy objectives," Shull cites the example of China allowing banned beef and chicken products to be smuggled in from Hong Kong. Dkt 104-3, ¶ 32. As part of the support for his opinion that China doesn't have a functioning regulatory system, Shull refers to an incident in which Monsanto used its personal relationships to get a shipment accepted. *Id.*, ¶ 145.

DeLong challenges any testimony based on these anecdotes on the ground that Shull doesn't provide any foundation for them. In response to DeLong's challenge to paragraph 32, Syngenta says that DeLong "ignores the rest of what that paragraph says." Dkt. 114, at 24–25. But Syngenta doesn't identify any other portion of the paragraph that provides a foundation for the statement. Syngenta also says that Shull explained in his deposition that he relied on "U.S. export statistics . . . along with [his] own observations, along with the observations of [his] staff and others." *Id.* at 25. Syngenta blames DeLong for failing to ask follow-up questions

about specific statistics and observations. But it was Shull's obligation to provide a foundation for all of his opinions in his report; it was not DeLong's obligation to sleuth out the foundation with pointed deposition questions. The court will exclude testimony based on paragraph 32.

In response to DeLong's challenge to paragraph 145, Syngenta says that Shull clarified in his deposition that he relied on "discussions among the traders." Dkt. 128-3, at 186:9–10. But Shull didn't identify anyone specific, and he admitted that he hadn't spoken to any exporters who had used personal relationships to influence Chinese officials. Syngenta also cites deposition testimony of Cargill, Inc. employees as providing a basis for the statement, but Shull did not rely on that testimony in his report or his deposition. The court will exclude the statement about Monsanto.

### d.  Opinions about the World Trade Organization (WTO)

DeLong seeks to exclude "opinions about various WTO matters" that are in paragraphs 65, 67, and 69 through 72 of Shull's report. This issue was not previously considered by the MDL court, and Syngenta does not contend that DeLong should be barred from raising the issue now.

DeLong does not identify any specific opinions, and a review of those paragraphs reveals that they are mostly factual statements about the WTO. For example, paragraph 65 discusses a negotiation between China and the WTO over tariff rate quotas, and paragraphs 71 and 72 describe a WTO investigation about China's tariff rate quotas. The only opinions appear to be in paragraphs 69 and 70 that certain conduct by China violated WTO rules.

Neither side explains how a potential WTO violation is relevant to any issue in this case. In any event, Shull doesn't identify in his report any expertise that he has about WTO rules, and he doesn't identify the basis for his opinion about rule violations. So the court will

exclude those opinions. In its opposition brief, Syngenta relies on Shull's deposition testimony in an attempt to fill in the gaps. But the disclosure must be in the report; an expert may not supplement a deficient report through deposition testimony. *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 641–42 (7th Cir. 2008). In any event, the testimony Syngenta cites isn't helpful. Shull says that "we . . . look to the WTO to see whether [a] standard in that country complies with WTO rules and regulations." Dkt. 128-3, at 13–22. He still does not provide the basis for his opinions in paragraphs 69 and 70.

The court will exclude any opinions from Shull about whether particular conduct violates WTO rules.

### e.   Opinions based on events or commentary outside the damages period

Section VII.C of Shull's report is called "Industry and Government Commentary Confirming My Opinions." Dkt. 104-3, ¶¶ 175–89. In that section, Shull quotes and summarizes various industry and U.S. government organizations criticizing China's regulatory system for several reasons, including that it is based on politics rather than science. DeLong seeks to exclude testimony based on that section because the statements and reports were issued "outside the damages period." Dkt. 132, at 22. But most of the statements refer to longstanding problems, so they may be indicative of the state of affairs earlier. As already noted, DeLong doesn't cite evidence that the way China operated its regulatory system changed significantly in recent years, so the court will allow these opinions.[5]

---

[5] Again, DeLong does not develop an argument that any of Shull's opinions should be excluded on the ground that they are not based on information that would have been available to Syngenta, so the court does not consider that issue.

### f.  China could have tested for MIR162 before 2013

DeLong seeks to exclude testimony based on paragraph 218, in which Shull states that "China would have the ability to test for MIR162 well before the rejections in late 2013." Dkt. 104-3, ¶ 218. The asserted relevance of the statement appears to be as support for the more general opinion that China's regulatory decisions were based on political rather than scientific concerns.

The MDL court excluded a similar statement on the ground that Shull did not provide a basis for it in his report. *In re Syngenta*, 2017 WL 1738014, at *3. Syngenta says that Shull's amended report fixes the problem because Shull now explains that Syngenta "made MIR162 detection methods available to [China] before the 2011 harvest," and China approved the method in June 2011. Dkt. 104-3, ¶ 218. Shull cites "Syngenta Dep. Ex. 69" to support the opinion.

Neither side provides a record cite for that deposition exhibit, but Delong says that it is a 2011 email that does not specify what testing methods might have been available, does not state whether any testing could be used to test imported grain, and does not indicate whether it was sent to any Chinese officials. Dkt. 132, at 19. Without a copy of the exhibit, the court cannot evaluate the parties' contentions.

So the court will reserve a ruling on this issue. If Syngenta can show that Shull has a foundation for this statement, the court will allow Shull to testify about it. The parties may wish to address the issue again in their motions in limine.

## C. Damages opinions

### 1. Syngenta's motion to exclude Colin Carter

DeLong's claimed damages fall into a few categories. The largest category is lost profits on DDGS sales, which DeLong calculates as about $12 million. DeLong also seeks damages for canceled contracts and unsuccessful mitigation efforts, totaling about $5.5 million.

Carter is DeLong's damages expert, and he is an agricultural economist. Syngenta challenges portions of Carter's testimony on the following grounds:

1) he did not provide an adequate basis for his benchmark period when calculating DeLong's lost profits on DDGS;

2) he did not provide an adequate basis for his damages period when calculating DeLong's lost profits on DDGS;

3) his method for determining DeLong's profit margins is not supported;

4) he did not consider possible causes for lost profits for DDGS other than China's ban on MIR162;

5) he does not support the period he chose for measuring DeLong's damages offset based on increased sorghum sales;

6) his opinions regarding damages for losses on sales contracts and on mitigation efforts are not based on expert analysis;

7) his opinion on sales contract losses is unreliable because it does not take account of expenses.

Syngenta also challenges three other categories of opinions: (1) DeLong suffered losses because of Syngenta's commercialization of Duracade; (2) Syngenta caused DeLong's losses related to canceled contracts, corn spread transactions, and barge transactions; and (3) any opinions Carter offered in other cases. The court need not consider any of these issues. The MDL court resolved the first issue: it concluded DeLong had not adduced evidence of damages caused by Duracade. Dkt. 174, at 9–14. As for the second and third issues, DeLong says that

23

it is not relying on Carter to show causation for those categories of damages, and it will not be relying on any of Carter's past opinions.

### a. Benchmark period for DDGS

Carter chose June 2013 to June 2014 as the period for measuring what profits DeLong could have earned on DDG exports to China but for Syngenta's alleged negligence. Carter explained that he chose June 2013 as a starting date to avoid the effects of China's antidumping investigations in 2012, which would have reduced imports. Dkt. 120-1, ¶ 44. He used June 2014 as the end point because China announced in July 2014 that it would no longer accept DDGS containing MIR162. *Id.*, ¶¶ 40–44.

Syngenta contends that Carter's testimony based on his chosen benchmark period should be excluded for four reasons, but the court isn't persuaded that any of Syngenta's criticisms render Carter's testimony inadmissible. First, Syngenta says that the benchmark period should not include any time after China began banning corn containing MIR162. But Carter calculated lost profits for DDGS, not corn, and it's undisputed that China began rejecting corn imports before it began rejecting DDGS imports. It was not unreasonable for Carter to tie the benchmark and damages period to the date when DeLong first started feeling the financial effects of China's decision to ban MIR162.

Second, Syngenta says that Carter should have accounted for the possibility that its DDGS sales were higher than they otherwise would have been after November 2013 (when China began rejecting corn shipments) because DDGS was still being accepted and customers would have been looking for a corn substitute. In response, DeLong cites Carter's deposition, during which he pointed to Table 3 of his report, which shows that DDGS imports in China stayed relatively constant after November 2013. Dkt. 105-1, at 54:1–55:21. Based on this,

DeLong says that Carter did not need to account for unusually high DDGS sales. Syngenta does not challenge that view in its reply brief.

Third, Syngenta says that Carter should have taken into account that DeLong's margins on DDGS sales were unusually high during the benchmark period. In response, DeLong says that Carter didn't need to account for this because DeLong was selling *and* buying DDGS during the relevant period, and that Carter calculated similar margins during an alternative benchmark period between July 2013 and February 2014. Dkt. 120, at 10–11. Again, Syngenta does not respond to this argument in its reply brief.

Fourth, Syngenta says that Carter should have considered the effect of corn and oil prices on DDGS supply and that DeLong's share of the DDGS export market was unusually high during the benchmark period. But Syngenta doesn't explain why either of those omissions renders Carter's benchmark period fundamentally unreliable. The general rule is that an expert's failure to consider every variable goes to the weight, not to the admissibility, of the expert's opinion. *See Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 772 (7th Cir. 2021). Syngenta hasn't shown that variations in corn and oil prices or DeLong's market share affected DeLong's profits so greatly that exclusion is required. Syngenta is free to raise this issue, as well as its other criticisms of Carter's benchmark period, during cross examination or with its own damages expert.

The court will not exclude Carter's opinions based on his choice of a benchmark period.

### b. Damages period

Carter chose a damages period of July 2014 to February 2015. July 2014 is when China announced that it would not accept DDGS containing MIR162 (several months after China stopped accepting corn shipments from the U.S.); February 2015 is approximately two months

after China approved MIR162. Carter says that the two-month lag time is appropriate to account for the time it would take to send product to China. Dkt. 120-1, ¶ 41. Syngenta says that that Carter should have included the same lag time at both the front and back end.

Syngenta is correct that Carter didn't explain the discrepancy in his report. But the reason is obvious: the delay at the back end caused by shipping times would not cause a similar delay at the front end. Once China began refusing to accept U.S. DDGS imports, any effect would be immediate, regardless of where in the shipping process a DDGS shipment was. If Syngenta has evidence showing otherwise, it is free to present that evidence at trial. But it is not a basis for striking Carter's testimony.

### c.  Method for determining margins

Carter's method of calculating DeLong's profit margins was straightforward: he started with DeLong's sales and then subtracted "the avoidable cost of goods sold, further reduced by the avoidable bulkhead charges." Dkt. 120-1, ¶¶ 42 n.44. This resulted in an average profit margin of positive $17.99 per metric ton during the benchmark period and negative $5.24 per metric ton during the damages period. *Id.*, ¶¶ 49–50 and Tables 2 and 3. Syngenta does not challenge this basic approach, but it says that Carter erred by omitting "DDGS that are 'in transit' but have not yet been invoiced even though they are already committed." Dkt. 102, at 19. If those figures had been included, Syngenta's expert, Walter Thurman, says that DeLong's average margin during the benchmark period would have been positive $13.15 per metric ton during the benchmark period and positive $6.68 during the damages period. *Id.* at 20 (citing Dkt. 105-3, ¶ 56).

In its response, DeLong acknowledges that Carter "account[ed] for contracts only as they were actually performed." Dkt. 120, at 18. DeLong calls this the "current month" method

and Thurman's approach the "accrual" method. But DeLong says that the difference between the two methods "is essentially the timing of when to count the transaction," and Thurman's method is not superior to Carter's. In other words, DeLong's position is that it doesn't matter which method you use, because all transactions will be accounted for at some point either way.

In its opening brief, Syngenta doesn't explain why Carter's approach is wrong. In its reply brief, it changes focus. It does not contend that it is inherently incorrect to look at performed contracts only. Instead, it says that Carter's error was counting *sales* that were invoiced and awaiting payment but not counting *costs* "that were incurred but remained outstanding." Dkt. 136, at 13–14. In other words, Carter included accrued revenue, but not accrued expenses, leading to an artificially high margin during the benchmark period.

If Syngenta's objection in its reply brief is accurate, the court agrees that it is a problem. But Syngenta does not point to portions of the expert reports or deposition testimony showing that Carter treated sales differently from purchases. In any event, arguments raised for the first time in a reply brief are forfeited. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012). If Syngenta can support this argument with specific citations to the record, it may include the argument in a motion in limine.

### d. Cause of decreases in DDGS exports

Carter attributes DeLong's reduction in profits from the benchmark period to the damages period to China's decision to ban MIR162. Syngenta contends that Carter did not use a reliable method to determine causation because he did not consider whether there may have been other causes unrelated to Syngenta. Syngenta points to two other causes that it says Carter should have considered.

First, Syngenta says that DeLong had offers from potential customers to buy DDGS during the damages period, but DeLong declined those offers because of port congestion on the U.S. west coast. Syngenta cites Carter's deposition testimony during which he was shown two DeLong emails stating that it was "refraining from offers" because of the congestion. Dkt. 105-1 (Carter Dep. 74:10–77:1).

Second, Syngenta says that the cost of bulk shipping went down during the damages period, which could have adversely affected DeLong's sales because it shipped DDGS by containers only and thus it may have lost sales to bulk shippers. Syngenta cites Thurman's report, in which Thurman says that the price of container shipping stayed relatively constant while bulk shipping went down during this time and that the changes "in relative bulk shipping costs coincide with the increase and decrease in DeLong's share of total U.S. DDGS exports observed during Dr. Carter's benchmark period." Dkt. 105-3, at ¶¶ 44–45.

In ruling on the admissibility of expert testimony, one of many factors a court may consider is "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702, 2000 Committee Note (listing 10 factors that may be relevant). A failure to consider other factors may require exclusion of expert testimony when the omitted cause could have been the *sole* cause of the plaintiff's harm. *See Liebhart v. SPX Corporation*, 917 F.3d 952, 962–63 (7th Cir. 2019); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433–34 (7th Cir. 2013); *Gayton v. McCoy*, 593 F.3d 610, 618–19 (7th Cir. 2010). In that situation, the expert's failure to consider the factor may render the opinion fundamentally unreliable.

In this case, the question for the jury on causation is whether Syngenta's conduct was a substantial factor in bringing about DeLong's damages. *Morgan v. Pennsylvania General Ins.*

*Co.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660, 666 (1979). Carter's report meets that standard. Sixty-five percent of Delong's DDGS exports went to China before the DDGS ban, Dkt. 120-1, ¶ 48, so it is reasonable to infer that the loss of the Chinese market would have a substantial effect on Delong's profits. Carter supports his opinion by comparing a benchmark period with a damages period. That's enough to allow a reasonable jury to infer causation. Syngenta cites no evidence that port congestion or variations in shipping prices were the sole causes of DeLong's lost profits, so Carter's failure to discuss these issues goes to the weight of his opinion, not its admissibility. Again, Syngenta is free to raise these issues on cross examination or through its own damages expert.

### e. Sorghum offset

In an attempt to mitigate its losses from reduced DDGS sales, DeLong began exporting sorghum to China. Carter offset his damages calculation with the profit that DeLong made on its sorghum sales from June 2014 to February 2015, which Carter says was approximately $2.3 million. Dkt. 120-1, ¶¶ 51–53. That profit excludes approximately $340,000 in capital improvements that DeLong made to its facilities so that it could transport sorghum without risking contamination with DDGS. *Id.*, ¶ 53.

Syngenta agrees with Carter that an offset is appropriate. But Syngenta says that Carter ended the offset period too soon, reasoning that Carter deducted all of DeLong's expenses from the offset, so the offset period should have continued while DeLong was continuing to sell sorghum and recouping those expenses. DeLong says that it was reasonable for Carter to use the same end date for the sorghum setoff as he did for calculating damages.

Syngenta has raised a fair point that Carter should have amortized the cost of its investment. But the court concludes that this is another criticism that goes to the weight of Carter's testimony, not its admissibility. Syngenta may raise the issue on cross examination.

### f.  Losses other than lost profits

In addition to lost profits, DeLong seeks damages for losses on canceled contracts and losses on other transactions DeLong entered into to mitigate its losses, including corn futures and barge transactions. Syngenta says that Carter should not be permitted to testify about any of those alleged losses because the numbers in his report are not based on any expert analysis. Rather, Carter's only contribution was to add up numbers that DeLong gave him for the contract price and the market price for each transaction; he did not determine the market price himself.

The court has no objection to Carter relying on data obtained from another source, and it could be helpful for the jury for one witness to tabulate DeLong's claimed damages.[6] The larger question is where that data comes from. DeLong doesn't clearly explain how it calculated the figures that Carter is using. For example, DeLong doesn't dispute Syngenta's contention that at least some of the figures from DeLong that Carter relied on are based on adjustments to market prices, but DeLong doesn't identify the basis for those adjustments.

---

[6] DeLong points to one difference between the damages that it calculated for barge transactions in its discovery responses and the damages that Carter calculated for those transactions. *Compare* Dkt. 105-6, at 11 ($1,835,649) *with* Dkt. 120-1, at 37, Table 10 ($1,834,094). But Carter doesn't explain in his report why there is a difference. DeLong says that Carter can explain this at trial, but an expert must include the basis for an opinion in his report. *Ciomber*, 527 F.3d at 641-42. So if Carter is allowed to testify at all about these damages, he will have to use the figures that DeLong provided.

So the court will not preclude Carter from using data that DeLong provided to him, so long as he makes it clear that the data was provided to him, and he is not offering an opinion about the accuracy of the data. DeLong will have to show the basis for the data it provided Carter.

### g. Expenses saved on canceled DDGS contracts

To calculate DeLong's damages for a canceled contract, Carter took the difference between the contract price and the fair market value at the time of cancellation, less any payments that DeLong had already received. Dkt. 120, at 24. Syngenta challenges this method because it doesn't take account of expenses that DeLong saved.

DeLong says that it excluded saved expenses from calculations because that is what the rules of the National Grain and Feed Association instruct. But those rules aren't binding on this court. The relevant question is how Wisconsin courts measure damages in a tort case. The answer is straightforward: "Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence." *Dumer v. St. Michael's Hospital*, 69 Wis. 2d 766, 773, 233 N.W.2d 372, 375 (1975). In other words, the question is what amount of money is necessary "to place the injured party in as good a position as he or she would have been in had the tortious conduct not occurred." *Kim v. American Family Mutual Insurance Co.*, 176 Wis. 2d 890, 898, 501 N.W.2d 24, 27 (1993).

Under this test, it is clear that the proper measure of damages must take into account the expenses that the plaintiff saved because of the defendant's negligent conduct. Carter's method for measuring damages on the canceled contracts didn't follow Wisconsin law, so his

opinion on this issue isn't reliable. Any reliable calculation of damages on canceled contracts must include saved expenses as well as lost profits.

### 2. DeLong's motion to exclude Quentin Mimms

Mims is a forensic accountant whom Syngenta offers to rebut Carter's opinions on damages. DeLong challenges three aspects of Mimms's expert report: (1) opinions that DeLong's mitigation efforts were "speculative"; (2) opinions based on a spreadsheet that Syngenta produced the day before Mimms's deposition; and (3) opinions about late shipments.

### a. Corn futures spread trades and barge transactions were "speculative"

As already discussed, DeLong says that it tried to mitigate its losses on DDGS exports through certain barge transactions and corn spread trades, but those mitigation efforts were unsuccessful, causing further losses. Syngenta sought summary judgment on the issue whether DeLong could prove that its losses on corn futures and barge transactions were caused by Syngenta, but the MDL court denied the motion on that issue. Dkt. 174, at 9–12. As for cause-in-fact, the court concluded that a reasonable jury could find that the alleged negligence was a substantial factor in causing DeLong's losses on these transactions. As for proximate cause, the court wrote that it could not "conclude at this stage that this is the rare and extreme case in which liability for causally-related losses should be precluded as a matter of public policy." *Id.* at 11. The court also concluded that "a question of fact remains for the jury concerning the reasonableness of DeLong's efforts to use these transactions to mitigate losses from rejected shipments." *Id.* at 12. Neither side questions these conclusions.

Mimms offers opinions about both the barge transactions and the corn spread trades. As for the corn futures transactions, Mimms says that "[l]osses from speculative trades cannot reasonably be attributed to Syngenta from an accounting and damages perspective." Dkt. 94-2,

at 15. He offers a similar opinion that DeLong's losses on the barge transactions are not attributable to Syngenta. *Id.*, at 20.

In support of his opinion regarding the trades, Mimms says that DeLong's decisions were based on a "series of assumptions" and "hunches," *id.*, ¶ 31, that the trades "deviated from the company's own customary practice," *id.*, ¶¶ 32–33, that DeLong's "trading strategy was untested by its grain merchandisers" and "did not provide an actual hedge against its physical contracts," *id.*, ¶ 32, and that "engaging in corn futures spread transactions because of a concern about the possible rejection of DDGS in China is inconsistent with its decision to trade on futures contracts for the very commodity that China had already recently rejected," *id.*, ¶ 34. In support of his opinion regarding the barge transactions, Mimms says that DeLong had no experience in barge transactions, *id.*, ¶ 40, that the transactions were inconsistent with DeLong's "normal business operations," *id.*, and that DeLong "failed to minimize its price exposure" because it entered into fixed sales contract in December 2013 while waiting to enter into corresponding purchase contracts until later, *id.*, ¶ 41.[7]

Mimms appears to be saying that DeLong's decisions to enter into the transactions were unreasonable and unforeseeable, so any losses on them shouldn't be attributed to Syngenta. That is how DeLong interprets the opinions, and it contends that the opinions are not admissible because Mimms is relying primarily on fact witnesses to support the opinions, and he isn't qualified to offer opinions about the reasonableness of DeLong's transactions. Syngenta doesn't respond directly to DeLong's arguments. Instead, Syngenta provides a different interpretation of the opinions, summarizing them as follows: "DeLong's barge sale and corn

---

[7] Mimms also offers opinions that DeLong did not properly calculate its losses on the trades and barge transactions, but DeLong doesn't challenge those opinions.

spread transactions reflect DeLong's attempts to profit off of anticipated price fluctuations in the corn and DDGS futures markets rather than attempts to mitigate or hedge against potential losses on particular open transactions or its DDGS position." Dkt. 122, at 18. Syngenta then cites a passage from Mimms's deposition testimony to support the proposition that the transactions were "unrelated" to Syngenta because the transactions were "not tied to the specific underlying contracts." *Id.* (quoting Dkt. 123-1, at 140:15–141:19).

If Syngenta means to assert that DeLong would have entered into the transactions regardless of Syngenta' conduct, that is a factual question that can be proven through fact witnesses. If Syngenta means to assert that there are policy or legal reasons why losses from the transactions should not be attributed to Syngenta, that is an argument to make to the court, not the jury. If Mimms's opinions are what they appear on their face—that the transactions were unreasonable investments—that may be a reasonable opinion, but Syngenta hasn't identified what Mimms's qualifications are to offer that opinion.

At this point, the court isn't persuaded that Mimms's opinions about the barge transactions and corn spread trades being "speculative" are based on an expert analysis that Mimms is qualified to give. But the court will give Syngenta one more chance to explain why the opinions in ¶¶ 31–37 and ¶¶ 39–41 of Mimms's report satisfy Rule 702. If Syngenta believes it can do that, Syngenta may file a motion in limine on that issue.

### b. Opinions based on spreadsheet and deposition testimony not reflected in report

DeLong seeks to exclude any testimony based on a spreadsheet that Syngenta produced after the expert disclosure deadline and one day before DeLong deposed Mimms. Syngenta describes the spreadsheet as an "aggregate [of] DeLong's own DDGS sales and purchase data

over a series of months as shown in its document production." Dkt. 122, at 9. Syngenta says that the purpose of the spreadsheet is to show that "DeLong was in fact in a significant short position when DeLong entered into the barge transactions," which, in turn, supports Mimms's opinion that the transactions were "speculative." *Id.* at 10 (citing Dkt. 122, ¶¶ 40–41).

DeLong objects to the spreadsheet and any related deposition testimony on the grounds that the spreadsheet is untimely and that Mimms did not say anything in his report about DeLong being "in a short position." This issued is intertwined with the previous one regarding the admissibility of Mimms's opinion that DeLong's mitigation efforts were speculative. So the court will reserve a ruling on the spreadsheet pending a decision on the opinion about the speculative nature of DeLong's mitigation efforts.

### c. Opinion about late shipments

In paragraph 26 of his report, Mimms challenges DeLong's claimed damages of $539,245 related to corn shipments that China rejected in December 2013. Mimms says that shipments were supposed to arrive in October—before China began rejecting corn shipments in late November 2013—and the shipping delay had nothing to do with Syngenta. So Mimms says that any losses related to those rejections are not attributable to Syngenta.

The court will not preclude Mimms from subtracting the $539,245 from his damages calculations. It is true that the damages are based on a factual assumption about what China would have done if the shipments had arrived sooner, and the evidence for that assumption is not expert analysis but testimony and shipping records showing that China was accepting corn shipments until November 2013. Dkt. 122, at 13. But an expert may base an opinion on factual assumptions, so long as those assumptions will be proven through other evidence. *See Raab v. Wendel*, No. 16-cv-1396 2017 WL 7371180, at *3 (E.D. Wis Dec. 18, 2017) (collecting cases).

The problem with Mimms's report is that he goes beyond identifying $539,245 as a category of damages that should be excluded based on an assumption that China would have accepted the shipments had they arrived on time. Specifically, Mimms offers his own *opinion* that China would have accepted the shipments. Mimms may not offer that opinion because it is not based on his expertise. Syngenta will have to prove that through fact witnesses. But Mimms may explain why he is excluding those damages, so long as he clarifies that his opinion on that point is based on a factual assumption.

## ORDER

IT IS ORDERED that:

1. DeLong's motion to exclude testimony from Christian Krupke, Dkt. 96, is GRANTED in part and DENIED in part as follows:

   a. Krupke may not testify about the economic benefits of MIR162 or other genetically modified corn.

   b. Krupke is not limited to testifying about the efficacy of MIR162 in Indiana.

   c. Krupke may not rely on information unless it would have been available to Syngenta at the time it commercialized MIR162.

2. Syngenta's motion to exclude testimony from Joseph Keashall, Dkt. 98, is GRANTED.

3. DeLong's motion to exclude testimony from Philip Shull, Dkt. 103, is GRANTED in part and DENIED in part as follows:

   a. Shull may offer opinions that China's review of GMO applications is based on politics rather than science and that China did not have a functioning regulatory system during the relevant time.

   b. Shull may not offer opinions about whether China is "a key market" for corn and whether China is a reliable importer of corn products.

   c. Shull may not offer opinions based on paragraphs 239 to 244 of his report.

    d.  Shull may not offer testimony about China allowing banned beef and chicken products to be smuggled in from Hong Kong or about an incident in which Monsanto used its personal relationships to get a shipment accepted.

    e.  Shull may not testify about whether particular conduct violates WTO rules.

    f.  Shull may offer testimony based on Section VII.C of his report.

    g.  The court will reserve a ruling on whether Shull may testify about whether China could have tested for MIR162 before 2013.

4.  Syngenta's motion to exclude testimony from Colin Carter, Dkt. 101, is GRANTED in part and DENIED in part as follows:

    a.  Carter may offer opinions based on his benchmark and damages periods.

    b.  The court will reserve a ruling on whether Carter may offer opinions based on his method for determining margins.

    c.  Carter may offer an opinion that Syngenta's conduct caused DeLong's lost profits on DDGS exports.

    d.  Carter may offer an opinion about the appropriate amount for a sorghum offset.

    e.  For his opinions on damages other than lost profits, Carter may rely on data provided by DeLong, so long as he makes it clear that the data was provided to him, and he did not make independent calculations. DeLong will have to provide the factual basis for that data through other witnesses.

5.  DeLong's motion to exclude testimony from Quentin Mimms, Dkt. 92, is GRANTED in part and DENIED in part as follows:

    a.  The court reserves a ruling on whether Mimms may testify that DeLong's mitigation efforts were speculative or unreasonable.

    b.  The court reserves a ruling on whether Mimms may rely on a spreadsheet produced after the expert disclosure deadline.

    c.  Mimms's damages calculations may exclude $539,245 related to corn shipments that China rejected in December 2013. But Mimms may not

offer his own opinion that China would have accepted the shipments if they had arrived on time.

Entered March 29, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge